## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Misty Stiles, | § | |
| Plaintiff, | § | |
| | § | CASE NO. 5:21-cv-1139 |
| | § | |
| v. | § | |
| | § | |
| TransUnion, LLC; Capital One Bank | § | |
| (USA), National Association; JPMorgan | § | |
| Chase Bank, National Association; and | § | |
| DOES 1 through 100 inclusive, | § | |
| | § | |
| | § | |
| Defendants. | § | |

COMES NOW Plaintiff **MISTY STILES** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

### INTRODUCTION

1.      This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2.      Defendant Capital One Bank (USA), National Association ("Capital One") is reporting an unauthorized account on Plaintiff's TransUnion, LLC ("TransUnion") report which includes multiple, derogatory notations. This account is detrimental to Plaintiff's credit score and her ability to obtain new credit, and Plaintiff is neither an obligor nor authorized user on the account.

3.      Defendant JPMorgan Chase Bank, National Association ("JPMCB") is not reporting the Plaintiff's account accurately as discharged in bankruptcy.

4.      The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

5. A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

6. The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

7. In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

8. Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

9. Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

10. This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

11. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

12. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

13. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

14. Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each of the named Defendants conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

15.     Plaintiff alleges that she was added as an authorized user to the Capital One account and is not personally liable for the debt. Plaintiff alleges she revoked her authorized user status on the account; however, Capital One is still reporting it on her TransUnion report as if she is still an authorized user.

16.     Plaintiff alleges the Capital One tradeline contains derogatory reporting which is lowering her credit score and her ability to obtain new credit.

17.     Plaintiff alleges the maker of the account filed Chapter 7 bankruptcy and the account was included and discharged.

18.     Plaintiff alleges that the JPMCB account was included in her Chapter 7 bankruptcy filing in that the debt occurred pre-petition and was subsequently discharged and fully satisfied.

19.     Plaintiff alleges that it is patently incorrect and misleading for a debt which was discharged and satisfied to be reported on a credit report with a past due current payment status as this reporting makes it appear as if the debt is still owed and collectible.

20.     Plaintiff alleges that each and every Defendant is familiar with FCRA requirements and subscribes thereto.

21.     Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

22.     Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair her FICO Score.

23.     In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

24.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

## A.    FICO, Inc.

25.    FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

26.    The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions. [1]

27.    A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

28.    Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

29.    Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

30.    There are twenty-eight (28) FICO Scores that are commonly used by lenders.

31.    A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

32.    The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

33.    FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

34.    There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

35.    Each of the five (5) factors is weighted differently by FICO.

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See* https://www.myfico.com (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score".

36.     In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

37.     Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

38.     In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

39.     Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

40.     FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

41.     A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id*.

42.     Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and

make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.    Metro 2**

43.    The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening, and collection services industries.

44.    The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by CDIA to universally report debts in a particular manner.

45.    The CDIA's Metro 2 format is the credit reporting industry standard for credit reporting. While CDIA's Metro 2 format is intended to standardize credit reporting, this standard is still subject to the FCRA's requirement of *maximum possible accuracy and completeness.*

46.    The credit reporting industry at large depends upon the Metro 2 format and the CDIA's recommendations for reporting debt.

47.    The CDIA is experienced in credit reporting. In support of this allegation, Plaintiff avers the following:

a.    The CDIA offers a FCRA certificate program for all CRAs.

b.    The CDIA offers a FCRA awareness program for all CRAs.

c.    The CDIA offers a FCRA certificate program for DFs.

d.    The CDIA offers a FCRA awareness program for DFs.

e.    The CDIA offers a Metro 2 learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 format as well as the relationship between multiple fields.

f.    The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.

g.    The CDIA developed a credit reporting resource guide for reporting credit.

48.    The CDIA's Metro 2 format is accepted by all CRAs.

49.    The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide ("CRRG").

50.    The CRRG outlines the industry standards for reporting debts using Metro 2 format.

51.    The CRRG is not readily available to the public. It can be purchased for $229.45.

52.     Even if a buyer is ready, willing, and able to pay for the CRRG, the CDIA will <u>not</u> grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

53.     When FICO calculates credit scores, the algorithms use Metro 2 information based on industry standards established by the CDIA.

54.     The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

55.     If the Metro 2 data received by FICO deviates from the FCRA requirements or industry standards, an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk resulting in less favorable lending terms.

**C.      e-OSCAR**

56.     e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

57.     When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

58.     The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

59.     When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

60.     When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

61.     For clarification, an AUD, or other regular transmission, is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**D.      Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

62.     When a consumer files bankruptcy, certain credit reporting industry standards exist.

63.     Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

64.     The Consumer Information Indicator ("CII") is a critical field in the Metro 2 format that indicates a special condition that applies to a specific consumer.

65.     Under Metro 2, the CII must be reported on only the consumer to whom the information applies.

66.     It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

67.     In the consumer bankruptcy context, CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed and is active, but no discharge has been entered.

68.     CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed and is active, but no discharge has been entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a tradeline. Such reporting alerts any potential lender that the account is no longer in a collectable status and is being handled by a Chapter 13 trustee.

69.     The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed, but the chapter is undesignated/unknown.

70.     The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

71.     The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged. In addition, post discharged balances and past due balances should be updated to reflect zero (0) balances. The payment history should also not reflect missed payments moving forward.

72.     The CII Metro 2 Code "R" denotes reaffirmation of a debt. In addition, completely reaffirmed debts should report appropriate Account Status and account information as it applies going forward.

73.     The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

74.     The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

75.     Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

76.     Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

77.     The FRCA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

78.     A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

79.     The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

80.     Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**E.      Plaintiff Filed Bankruptcy and Received a Discharge**

81.     Plaintiff filed a voluntary petition for Chapter 7 bankruptcy on October 14, 2020, in order to repair her creditworthiness and Credit Score.

82.     The Chapter 7 Trustee entered its report of No Distribution (no asset case) on June 25, 2019.

83.     Plaintiff's bankruptcy was discharged on January 26, 2021.

**F.      Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

84.     On June 3, 2021, Plaintiff ordered a three-bureau credit report from Experian to ensure proper reporting by Plaintiff's creditors (the "June 3 Credit Reports").

85.     Plaintiff noticed adverse tradelines in her June 3 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

86.     Plaintiff then disputed the inaccurate tradelines regarding the Capital One and JPMCB accounts via certified mail to TransUnion on or about June 29, 2021 (the "Dispute Letter").

87.     Plaintiff's Dispute Letter specifically put Capital One on notice that she filed for Chapter 7 bankruptcy and received a discharge and the reporting should be updated.

88.     Plaintiff's Dispute Letter specifically put JPMCB on notice that she filed for Chapter 7 bankruptcy and received a discharge and the reporting should be updated.

89.     Plaintiff's Dispute Letter also detailed what was perceived to be problematic about the accounts, addressing each tradeline individually.

90.     Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

91.     Plaintiff is informed and believes that TransUnion received Plaintiff's Dispute Letter and, in response, sent Plaintiff's dispute to Capital One and JPMCB, as the data furnishers, via an ACDV through e-OSCAR.

92.     On August 28, 2021, Plaintiff ordered a second three-bureau credit report from Experian to determine if her accounts were updated.

### a.     Inaccuracy – Capital One

93.     Despite actual knowledge, Capital One continued to report another consumer's account, beginning in 546325XXXXXX, to TransUnion as if Plaintiff was an authorized user. This account has a current payment status of "30 days past due", a balance of "$10,947", a past due amount of "$289" reported.

94.     Reporting an authorized user account after the authorized user designation has been revoked is patently incorrect. Further, as this tradeline is replete with derogatory information, the fact that it is showing on Plaintiff's credit report is lowering her Credit Score, and it is misleading to an extent to adversely affect credit decisions.

95.     Capital One did not update the reporting to delete the unauthorized account.

96.     Furthermore, the maker of this Capital One account was the Plaintiff's husband, Brian Stiles, who filed a Chapter 7 and was discharged on or around January 26, 2021. Capital One and TransUnion have since updated the maker's tradelines accurately, however neither Capital One nor TransUnion updated the Plaintiff's reporting to delete the unauthorized account.

97.     TransUnion provided notice to Capital One that Plaintiff was disputing the inaccurate and misleading information, but Capital One failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

98.     The most basic investigation would include a simple review of internal documentation on the account (i.e., the fact Plaintiff was merely an authorized user, had revoked such status, and the maker on the account had been discharged in bankruptcy) compared to its

reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

99.     Plaintiff alleges that Capital One did not review if its reporting complied with the unambiguous language of the FCRA, regulatory guidelines on accurate reporting under the FCRA, or its own internal records concerning Plaintiff's responsibility on the account.

100.     If Capital One reviewed such standards, or its own internal records regarding Plaintiff's responsibility on the account, Capital One would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

101.     By continuing to report the account to TransUnion as described in paragraph 93, it incorrectly appears to third parties viewing Plaintiff's credit report that Plaintiff is an authorized user on the account, which in inaccurate. Further, as this severely derogatory account is being used to calculate Plaintiff's Credit Score, the Credit Score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

102.     The lack of investigation and reporting of inaccurate and incomplete information by Capital One is unreasonable.

**b.     Inaccuracy – JPMCB**

103.     Despite actual knowledge, JPMCB continued to report Plaintiff's account, beginning in 426684XXXXXX, to TransUnion with a current payment status tradeline of "60 days past due" and without notice of the bankruptcy discharge. This tradeline is patently inaccurate as the account was discharged in bankruptcy.

104.     Plaintiff alleges that JPMCB did not investigate whether Plaintiff filed for bankruptcy.

105.     JPMCB did not update the tradeline to reflect that Plaintiff obtained a discharge in bankruptcy.

106.     TransUnion provided notice to JPMCB that Plaintiff was disputing the inaccurate and misleading information, but JPMCB failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

107.     Based upon Plaintiff's disputes, JPMCB should have known that Plaintiff received a discharged in her bankruptcy proceedings. In fact, JPMCB is accurately reporting a second

account as "Unrated or bankruptcy" on Plaintiff's TransUnion report. This adds to why its reporting of the account in question is misleading.

108.    The most basic investigation would include a simple review of its reporting in light of the fact that Plaintiff filed a Chapter 7 bankruptcy and received her discharge in order to determine if the reporting complies with the maximum possible accuracy and completeness standard of the FCRA.

109.    Plaintiff alleges that JPMCB did not review if its reporting complied with the unambiguous language of the FCRA, regulatory guidelines on accurate reporting under the FCRA, or its own internal records concerning Plaintiff's account.

110.    If JPMCB reviewed such standards, or its own internal records regarding Plaintiff's account, JPMCB would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

111.    JPMCB should have updated each tradeline to CII to Metro 2 Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy and removed the past due payment status.

112.    By continuing to report Plaintiff's account to TransUnion as described in paragraph 103, it incorrectly appears to third parties viewing Plaintiff's credit report that the account was not discharged in bankruptcy and is still owed and collectible, which in inaccurate.

113.    Further, as this inaccurate reporting is being used to calculate Plaintiff's Credit Score, the Credit Score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

114.    As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment status and payment history reported by JPMCB on the account is lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

115.    The lack of investigation and reporting of inaccurate and incomplete information by JPMCB is unreasonable.

**Damages**

116.    Plaintiff pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

117.    As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code, the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

118.    Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by and JPMCB. Plaintiff's low credit score, resulting from JPMCB's inaccurate reporting, has caused her to abandon her intentions to apply for certain credit.

119.    Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by Capital One. Plaintiff's low credit score, resulting from Capital One's inaccurate reporting, has caused her to abandon her intentions to apply for certain credit

120.    Capital One's and JPMCB's actions, as alleged herein, are each in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

## FIRST CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))

### (Against Defendants and Does 1-100)

121.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    TransUnion Failed to Assure Credit Reporting Accuracy**

122.    TransUnion violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

123.    Had TransUnion maintained reasonable procedures to assure maximum accuracy, it would have never reported the Capital One and JPMCB accounts as described herein.

124.    TransUnion knew, or should have known, that (1) Plaintiff revoked her authorized user status on the Capital One account, (2) the tradeline was derogatory and detrimental to Plaintiff's Credit Score, and (3) as Plaintiff was not responsible on the account, had revoked her user status, and the maker on the account had received a bankruptcy discharge, the account should not be showing on her credit report. Further, TransUnion knew, or should have known, that continuing to report the account does not reflect maximum possible accuracy and completeness as required by the FCRA.

125.    TransUnion knew, or should have known, (1) that the JPMCB account was discharged in bankruptcy, and (2) that the account should not have been reported with a current payment status of "60 days past due" as the debt was discharged. Further, TransUnion knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

126.    As a result of TransUnion's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

**B.    Willful Violations**

127.    TransUnion's violations, as described herein, were willful; specifically, TransUnion has intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

128.    TransUnion regularly, as a policy, ignores disputes by consumers and fails to perform even a basic investigation regarding the disputes. Additionally, TransUnion regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

129.    To the extent TransUnion does send consumer disputes, it sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

130.    TransUnion's employees receive little to no training concerning how to accurately report consumer debt.

131.    Instead, TransUnion's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

132.    TransUnion's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

133.    TransUnion has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

134.    As a result of TransUnion's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation,

dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

135.    TransUnion's violations were willful, rendering it liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

136.    In the alternative, TransUnion was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

137.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**SECOND CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))**

**(Against Defendants and Does 1-100)**

138.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Capital One Failed to Reinvestigate Following Plaintiff's Dispute**

139.    Pursuant to 15 U.S.C. §§ 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

140.    Despite having revoked her authorized user status, Capital One sent and AUD or monthly transmission to TransUnion reporting the account as currently past due, with an outstanding balance, past due amount, and as if Plaintiff was an authorized user.

141.    After receiving the Plaintiff's Dispute Letter, Capital One did not delete the unauthorized tradeline on the TransUnion report. Instead, despite having knowledge of Plaintiff's revocation, and notice that the maker on the account received a bankruptcy discharge, Capital One verified and re-reported the tradeline to TransUnion via ACDV as if Plaintiff was still an authorized user, and as if there was an outstanding balance and past due amount that was currently past due.

142.    Capital One violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation at all or by failing to conduct a reasonable investigation, and under either event, re-reporting misleading and inaccurate account information.

143.    TransUnion provided notice to Capital One that Plaintiff was disputing the inaccurate and misleading information; however, Capital One failed to conduct a reasonable investigation as required by the FCRA.

144.    Based on Plaintiff's disputes, Capital One should have known the account was not authorized and should have ceased its inaccurate reporting.

145.    It is undisputable that the Capital One account in question contains multiple derogatory items, that Plaintiff was merely an authorized user on the account, and that the account does not have a balance or past due amount as it was discharged in bankruptcy. Reporting an account on a consumer's report as an authorized user when they have revoked their right to be one is patently incorrect.

146.    In addition, this inaccurate reporting also adversely affects credit decisions. Derogatory marks like late payments and charge off payment status goes into calculating a Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported Credit Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, Capital One's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and her ability to rebuild her credit score and obtain new credit.

147.    The lack of investigation by Capital One, as required by the FCRA, is unreasonable.

**B.      JPMCB Failed to Reinvestigate Following Plaintiff's Dispute**

148.    Pursuant to 15 U.S.C. §§ 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

149.    After receiving notice that Plaintiff filed for Chapter 7 bankruptcy, JPMCB sent an AUD or monthly transmission to TransUnion reporting Plaintiff's account as past due.

150.    After receiving notice of the bankruptcy discharge, JPMCB did not update the incorrect reporting to TransUnion.

151.    After receiving the Dispute Letter, JPMCB did not correct the payment status, but instead verified and re-reported the current payment status as "60 days past due" via ACDV to TransUnion.

152.    The payment status reported in an AUD, monthly transmission, or ACDV represents the status of the account at the time of sending the AUD, monthly transmission, or ACDV, and is not a historical contractual item (i.e., monthly payment, highest balance, payment history, etc.). Therefore, even in the event the account was previously past due, if at all, it has no bearing on its *current* pay status after the account was discharged in bankruptcy.

153.    JPMCB violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

154.    TransUnion provided notice to JPMCB that Plaintiff was disputing the inaccurate and misleading information; however, JPMCB either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

155.    Based on Plaintiff's disputes, review of its internal records on the account, and its reporting to TransUnion of another JPMCB debt as discharged in bankruptcy, JPMCB should have known its account was discharged in bankruptcy and fully satisfied and ceased its inaccurate reporting.

156.    Reporting a discharged debt with a currently payment status of past due is patently incorrect.

157.    In addition, this inaccurate reporting also adversely affects credit decisions. This inaccurately reported account is being considered when calculating Plaintiff's Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported Credit Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, JPMCB's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and her ability to rebuild her Credit Score and obtain new credit.

## C.    Willful Violations

158.    Plaintiff alleges that Capital One and JPMCB have each reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

159.    Plaintiff further alleges that Capital One and JPMCB have each not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, have developed reckless policies and procedures.

160.    Plaintiff alleges that rather than train its employees on accurate credit reporting, FCRA requirements, and industry standards, Capital One's and JPMCB's respective employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

161.    Capital One's reporting is willful as it is correctly reporting this same account on the maker's credit reports, while choosing to report derogatory information on Plaintiff's report as described herein. Further, as Plaintiff has no longer authorized this account to be reported, Capital One's is reporting an unauthorized derogatory account in order to injury Plaintiff's Credit Score.

162.    JPMCB's reporting is willful as it correctly reported another debt of Plaintiff to TransUnion as discharged in bankruptcy. Reporting one debt as discharged while reporting another as still past due is likely to mislead credit reviewers to believe this account was not discharged in bankruptcy but is still owed and collectible.

163.    In the alternative, Capital One and JPMCB were each negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

**D.      TransUnion Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

164.    Pursuant to 15 U.S.C. 1681i(a)(1), TransUnion was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's disputes regarding the Capital One and JPMCB accounts.

165.    Thus, TransUnion failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

166.    TransUnion is not a passive entity bound to report whatever information a data furnisher provides.

167.    Plaintiff alleges TransUnion is readily familiar with FCRA requirements and credit reporting industry standards.

168.    Based on the foregoing, Plaintiff alleges that TransUnion can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

169.    TransUnion can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

170.     TransUnion failed to conduct a reasonable investigation because any basic investigation would have uncovered that Capital One was not reporting its account at issue correctly.

171.     Had TransUnion conducted a proper investigation, it could have suppressed the Capital One debt from reporting on Plaintiff's credit report. However, TransUnion continued to report the account as described herein.

172.     TransUnion failed to conduct a reasonable investigation because any basic investigation would have uncovered that JPMCB was not reporting its account at issue correctly.

173.     Had TransUnion conducted a proper investigation, it could have closed or bookended the JPMCB debt by adding a notation on the credit report to show that the debt was in fact discharged in bankruptcy and removed the past due payment status. However, TransUnion continued to report the account as described herein.

174.     In the alternative, Plaintiff alleges that TransUnion did not send an ACDV to Capital One or JPMCB to confirm accurate reporting on its respective accounts. Despite receiving the Dispute Letter providing notice of the inaccuracies, TransUnion did not delete or correct the tradelines or conduct an investigation.

175.     TransUnion, therefore, did not conduct even the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

### THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Defendants and Does 1-100)

176.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     TransUnion Failed to Review and Consider all Relevant Information**

177.     TransUnion violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

178.     TransUnion's violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.      Willful Violations**

179.     TransUnion's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

180.     In the alternative, TransUnion was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

181.     Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**FOURTH CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))**

**(Against Defendants and Does 1-100)**

182.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.      TransUnion Failed to Delete Disputed and Inaccurate Information**

183.     TransUnion violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

184.     TransUnion's violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.      Willful Violations**

185.     TransUnion's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

186.     In the alternative, TransUnion was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

187.     Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

188.   WHEREFORE, Plaintiff prays for judgment as follows:

   a.   For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

   b.   Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

   c.   Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

   d.   Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

   e.   For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

   f.   For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.


Respectfully submitted,


**SCHUMACHER LANE PLLC**

Dated: November 17, 2021          */s/ Kyle Schumacher*
                                   Kyle Schumacher
                                   **Attorney for Plaintiff**

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of this matter by jury.


                                        **SCHUMACHER LANE PLLC**

Dated: November 17, 2021                */s/ Kyle Schumacher*
                                        Kyle Schumacher
                                        Attorney for Plaintiff